IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SYMANTEC CORPORATION,           )
                                )
            Plaintiff,          )    TC-MD 130286N
                                )
      v.                        )
                                )
LANE COUNTY ASSESSOR,           )
                                )
            Defendant           )
                                )
      and                       )
                                )
DEPARTMENT OF REVENUE,          )
State of Oregon,                )
                                )
            Defendant-Intervenor.  )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on February 26, 2014. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff appealed the real market value of property identified as Accounts 1542495, 1518727, and 1854049 (subject property) for the 2012-13 tax year. A two day trial was held in the Oregon Tax Courtroom in Salem, Oregon, beginning November 5, 2013. Christopher K. Robinson, Attorney at Law, appeared on behalf of Plaintiff. James C. Wallace, Senior Assistant Attorney General, appeared on behalf of Defendants. Richard P. Herman (Herman), MAI, testified on behalf of Plaintiff. Roxanne Gillespie (Gillespie), appraisal manager, testified on behalf of Defendants over Plaintiff's objection. Jason Baribeault (Baribeault), commercial and industrial appraisal manager, testified on behalf of Defendants. The court received Plaintiff's Exhibits 1 and 3 to 10, Defendant's Exhibits A and B, and the parties' post-trial briefs.

The parties stipulated at trial that the 2012-13 land real market value of the subject property is $13,447,460, as stated on the 2012-13 tax and assessment rolls, and that the 2012-13 real market value of the subject property's machinery and equipment was $1.4 million. (Def's Post-Trial Br at 1-2; Ptf's Ex 1 at 9, 14.) The 2012-13 real market value of the subject property's buildings and structures is at issue.

## I. STATEMENT OF FACTS

A.     *Description of the subject property's improvements*

The subject property is the Symantec Technical Support and Customer Service Center facility located in Springfield, Oregon. (Ptf's Ex 1 at 2.) The parties stipulated that the subject property's buildings totaled 405,000 square feet. (*See* Ptf's Post-Trial Br at 1; Inv's Post-Trial Br at 2.) Herman described the subject property as "a (LEED) Gold certified build-to-suit call center which was constructed in two phases."[1] (Ptf's Ex 1 at 5.)

> "The initial phase of the facility consists of the easterly building ('A') which was completed in 2002. It is a two-story Class 'A' building which has approximately 204,662 square feet of floor area * * *. The main floor supports a reception/security check area, employee cafeteria with commercial kitchen, fitness center, restrooms, conference rooms and platform office. The upper floor level is primarily platform office together with conference and training rooms. The second phase of the facility consists of the westerly building ('B') which was completed in 2006. The build-out primarily consists of platform office together with conference/meeting rooms, lab rooms, a receiving/shipping area and secure server rooms."

(*Id.* at 5-6.) Building B has "ground floor area approximating 207,142 square feet, of which roughly 26,000 square feet is unfinished shell." (*Id.* at 10.) The subject property's two buildings are connected by a " 'spine' corridor which has a 10'x300' skylight, bamboo flooring and custom millwork." (*Id.* at 6.) Herman wrote that the subject property "facility serves as a 'Tier

---

[1] LEED is Leadership in Energy and Environmental Design. (Ptf's Ex 1 at 5.) Herman testified that the LEED certification designates that a building meets certain energy efficiency standards.

One' for Symantec, which is the sole occupant. It has redundant uninterrupted power supply (UPS) and connectivity to two (2) substations in addition to the generator back-up." (*Id.*) Herman testified that the UPS provides back up power if there is a power outage.

Herman testified that that the subject property's secure areas house servers, dry labs, the power supply room, and the unfinished space. Plaintiff provided floor plans for the subject property identifying areas other than office space. (Ptf's Ex 1 at 46-49 (non-office areas are shaded).) There is no dispute that the majority of the subject property's building space was used for office space. (Inv's Post-Trial Br at 13; *see also* Def's Ex A at 22, 26.)

Both of the subject property's "buildings have undergone extensive seismic retrofitting which was completed in 2011. The structural improvements are now capable of supporting a Level 9 seismic event." (Ptf's Ex 1 at 6.) Herman testified that he is not aware of any other call centers retrofitted to withstand a "level 9 seismic event." He testified that he is not aware if Plaintiff wanted the seismic upgrade or if it was required by one of Plaintiff's contracts.

Baribeault agreed that the subject property's buildings were "Class A." (Def's Ex A at 22.) He determined that "[t]he subject property * * * [has] an economic life of 50 years, with an effective age of 8 years, considering the two separate phases of construction, thus indicating remaining economic life of approximately 42 years." (*Id.* at 23.) Baribeault testified that the subject property was in "excellent" condition and highlighted several of its amenities. He testified that the subject property is Plaintiff's fourth largest office.

B.     *Location and zoning*

The subject property is zoned Campus Industrial (CI), which "allows the siting of light industrial manufacturing, office and supporting commercial uses." (Ptf's Ex 1 at 27.)

> "Examples of uses permitted on an outright basis include business parks, call
> centers, corporate headquarters, data processing and related services, educational

facilities, high impact public facilities, internet publishing and broadcasting, laboratories, research [and] development complexes, light industrial manufacturing and mail distribution facilities."

(*Id.*) The subject property is located "within the McKenzie-Gateway Special Light Industrial District[,]" which is an "area of the city [that] has been designated for intensive light industrial, high tech and office type development." (*Id.* at 7.) Other employers in the area "include the Royal Caribbean International Call Center, * * * Pacific Source Healthcare, Oregon Medical Laboratories, Sacred Heart Medical Center, Yogi, Richardson Sports, the International Marketplace/Hawes Financial Center, FedEx and Brattain International Trucks." (*Id.*) Herman testified that most of the properties in the area are owner-occupied, like the subject property. (*Cf id.* at 8.) Herman testified that the subject property derives a "synergistic benefit" from the surrounding property uses.

C.       *Highest and best use*

Herman concluded that the subject property's highest and best use "is supporting a technical support and customer service call center, such as the existing use and occupancy, or some other form of adaptive reuse such as a data center, corporate headquarters or government offices." (Ptf's Ex 1 at 6.) He testified the subject property could probably be "repositioned" for a two-tenant use because it has two buildings. Herman wrote "[t]he existing land use represents one form of highest and best use inasmuch as it is an economically viable and financially productive legal use of the subject site. Its financial feasibility is inextricably tied to its owner/user occupancy by [Plaintiff]." (*Id.* at 30.) Herman concluded that "there are no physical or functional features of the [subject property] building shell that adversely influence its market position. It is nonetheless suitable for adaptive reuse * * *." (*Id.*)

/ / /

Baribeault testified that he characterized the subject property as a "data center" rather than as a "call center." (*See* Def's Ex A at 23.) He testified that the subject property differs from a typical call center because of its significant number of servers. Baribeault testified that he considered the subject property to be a "special use" property, noting that it was characterized as "flagship property" for Plaintiff and included superior features, such as a basketball court, glass atriums, bamboo floors, a skylight, and a "Halo room," as well as upgrades for servers and data storage. Baribeault concluded:

> "There are no alternative uses [of the subject property] that could reasonably be expected to provide a higher present value than the current use. The subject property should continue to operate as a Computer Data Center for [Plaintiff] and as a single tenant, owner user building."

(*Id.* at 23-24.) He determined that the existing use of the subject property was "maximally productive" for the subject property as improved. (*Id.* at 24.)

D.      *Market area and conditions*

Herman considered the subject property's market area to be "the entirety of Oregon and Washington." (Ptf's Ex 1 at 13.) Herman provided an excerpt from the July 2013 " '*Eugene Mid-Year Report*' published by Sperry Van Ness Commercial Real Estate Advisors":

> "The call center market continues to be stable and improving, the local market has provided a selection of sites, a dialect neutral population and with the universities and community colleges, a trainable workforce with direct application available through cooperation with those institutes in crafting coursework to fit the need. Lease rates appear to be trending slightly upward over neutral with Class 'A' rents ranging from $1.65 to $2.00 per month, full service."

(*Id.* at 23 (internal quotation marks omitted).) Herman also "surveyed the McKenzie-Gateway Business Park which appear[ed] to have relatively few vacancies as a result of a majority of the properties being owner-user." (*Id.* at 24.) He observed "the McKenzie-Gateway sub-market has remained relatively stable subsequent to recovery in 2010 from the 2008 recession." (*Id.*)

Herman concluded that, "[a]s evidenced by the comparables presented in [his] Sales Comparison Approach, it would appear that there is an active market for larger scale facilities which were originally built to support call centers, data centers or high tech type manufacturing." (Ptf's Ex 1 at 65.) Baribeault testified that he did not think that there was an active market for properties such as the subject property and was not aware of any data center sales.

E.    *Approaches of value*

Both Herman and Baribeault developed value indications under the sales comparison and cost approaches, although they disagreed on which approach provided the more reliable result. (*See* Ptf's Ex 1 at 13; Def's Ex A at 25, 31.) Both found the income approach to be inapplicable because properties such as the subject property are typically owner occupied. (Ptf's Ex 1 at 13; Def's Ex A at 25.) Herman placed primary reliance on the sales comparison rather than the cost approach because the subject property "competes within an active market environment, thus the Cost Approach would * * * be relevant as a primary value indication only if just compensation were the type of value being reported." (Ptf's Ex 1 at 13.) He placed "secondary reliance" on the cost approach, finding it to be "critically weakened by a substantial and inexacting [*sic*] depreciation adjustment." (*Id.*)

Baribeault noted the cost approach is "particularly applicable * * * when the property has unique or specialized improvements for which there is little or no sales data from comparable properties, such as the subject." (Def's Ex A at 25.) He considered the cost approach to be the "most relevant and applicable" approach because the subject property "is a recently constructed and special purpose facility * * *." (*Id.* at 16, 31.) Baribeault concluded that the sales comparison approach was also relevant because "many of the Data Centers are owner occupied * * *[.]" (*Id.* at 16.) However, he placed less weight on the sales comparison approach, noting

that it is "less reliable in an inactive market, or when estimating the value of properties for which no real comparable sales data is available." (*Id.* at 25.)

1.    *Plaintiff's sales comparison approach*

Herman presented six sales and one listing of properties that he considered to provide "meaningful market comparisons" to the subject property. (Ptf's Ex 1 at 55-57.) He reported that all of the properties "essentially fall within the excellent (Class 'A') quality segment of the market * * * notwithstanding a broad range of build-out features." (*Id.* at 55.) Based on his sales, Herman concluded an indicated real market value of $65 per square foot, or $26,325,000, for the subject property as of January 1, 2012. (*Id.* at 64.)

Herman considered his first three sales to be low indicators of value, although he considered sales 2 and 3 to be "influential as a result of locational proximity, physical similarity and unique functionality." (Ptf's Ex 1 at 63-64.) Herman's sale 1 was "the former Applied Materials Laser Tech tool manufacturing facility," built in 1998 and LEED Gold certified, which sold for $42.99 per square foot for "[a]daptive re-use" as "a telecommunications facility and data hotel." (*Id.* at 55-56.) The facility included 176,800 square feet of floor area, of which 32,000 square feet was Class 'A' office that "supported the former corporate headquarters"; "a 56,500 square foot clean room"; "an 18,000 square foot shipping and receiving area"; an "11,000 square foot central utility room"; a "5,000 square foot cafeteria" and "full commercial kitchen"; and "33,800 square feet of upper floor level platform and administrative office." [2] (*Id.* at 55-56.)

Herman's sales 2 and 3 were both located near the subject property in Springfield. (Ptf's Ex 1 at 58-59.) Sale 2, the "former Sony Music Entertainment optical disc manufacturing

---

[2] On a grid included in his appraisal report, Herman reports 55,800 square feet of Class "A" office. (Ptf's Ex 1 at 56.) The location of the balance of that office space is unclear from Herman's narrative; possibly it is a portion of the 33,800 square feet of upper floor space. (*Cf. id*. at 55.)

facility" built in 1995 and in "[a]verage" condition, sold for $44.13 per square foot for "[r]epositioning of the facility [that] was estimated to take one to two years." (*Id.* at 56, 59.) The property had 327,000 square feet of gross floor area with build out including "a café with commercial kitchen, retail space, a facility support center, clean rooms and climate-controlled warehouse with 28-foor clear height [,] * * * manufacturing space and office area." (*Id.* at 59.) Herman testified that he did not know the square footage for each of the component uses of sale 2. Sale 3, "a general purpose manufacturing and warehouse facility" built in 1995, sold for $47.52 per square foot to "a local sport cap manufacturer[.]" (*Id.* at 56, 59-60.) The facility included 136,253 square feet of floor area, of which "15,000 square feet * * * was Class 'A' office space" and the remainder "supported manufacturing, warehousing and shipping activities." (*Id.* at 56, 59.)

Herman concluded that sale 4 "is the most influential due to physical and functional similarity." (Ptf's Ex 1 at 63.) Sale 4, a "290,000 square foot office complex" built in 1987 and located in Everett, Washington, was purchased as an investment property for $65.52[3] per square foot "for repositioning exclusively as Class 'A' office space." [4] (*Id.* at 56, 60-61.) The property "consist[ed] of four-story and six-story towers which [were] connected by a glass atrium lobby" and featured an "open floor plan which is particularly suitable for a call center, extensive window lines, fitness center and monument signage." (*Id.* at 60.) One of the towers, "formerly a call center" and "regional headquarters for Qwest/Frontier," was approximately 120,000 square feet, of which 60,000 square feet was "contiguous." (*Id.*)

///

---

[3] (*But cf.* Ptf's Ex 1 at 61 (reporting sale price of $65.80 per square foot).)

[4] The seller of sale 4 planned to "lease back approximately 125,000 square feet of the building." (Ptf's Ex 1 at 60.) Herman testified that the lease back was to accommodate both the buyer and the seller in the short term while the buyer was repositioning the property.

Herman concluded sales 5 and 6 established "an upper unit value threshold for the subject" property due, in part, to the superior location of those properties. (Ptf's Ex 1 at 63.) Sale 5 was a 54,095-square-foot building located in Hillsboro that was "built-to-suit in 1998 as a company headquarters for * * * a company that manufactures railing systems for patios and decks." (*Id.* at 61.) It was purchased by a medical equipment manufacturer for an "effective sale price" of $73.20 per square foot.[5] (*Id.*) Sale 5 included 9,790 square feet of "high quality office space with glass interior partitions and high end finishes such as marble counters and wood paneled executive office." (*Id.*) The remainder of the space was a warehouse and manufacturing area. (*See id.*)

Sale 6, located in the Snoqualmie Ridge business park in Washington, "was constructed in 1999 for Optiva as a corporate headquarters for an electronic toothbrush business (Sonicare)." (Ptf's Ex 1 at 61-62.) It included "138,000 square feet of Class 'A' office space"; 39,000 square feet of warehouse; "a lab facility"; a health club; a locker room; and a "cafeteria with full commercial kitchen." (*Id*. at 62.) Sale 6 was purchased for $78.56 per square foot by a medical equipment manufacturer, but "had also been marketed as a call and data center." (*Id*. at 57, 62.)

Gillespie testified that Herman's sales are not comparable to the subject property because of the large percentages of warehouse and manufacturing space as compared with office in each of Herman's sales. She testified that several of Herman's sales included clean rooms, which are not comparable to any space in the subject property because clean rooms are designed to be sterile manufacturing spaces, whereas the subject property has carpeting and finished walls.

///

///

_____

[5] Herman reported Acumed made "an all cash offer of $5,000,000 with a 60 day escrow, but the seller was motivated to sell quickly and countered with a $60,000 deduction in order to close in 30 days." (Ptf's Ex 1 at 61.)

2.    *Defendant's sales comparison approach*

Baribeault presented nine sales, five in the Eugene/Springfield area, two in the Portland metropolitan area, and two in the Seattle metropolitan area. (Def's Ex A at 28.) The properties sold between January 2008 and December 2011. (*Id.*) Baribeault testified that he made downward time adjustments to the 2008, 2009, and 2010 sales, but not to the 2011 sales, resulting in adjusted sale prices ranging from $106.85 to $421.20 per square foot. (*See id.*) He concluded an adjusted price of $210 per square foot, or $85,050,000, for the subject property. (*Id.*)

Baribeault testified that he considered sale 1 to be the most comparable to the subject property and placed primary emphasis on his first three sales located in the Eugene/Springfield area. (Def's Ex A at 28.) Baribeault's sale 1, the Royal Caribbean Travel Call Center (Royal Caribbean), was a 166,640-square-foot facility built in 2005 that sold for a time-trended price of $245.83 per square foot. (*Id.* at 28, 33.) Baribeault's sale 2 was a 106,368-square-foot office facility built in 1990 that sold in for a time-trended price of $126.30 per square foot.[6] (*Id.* at 28, 34.) His sale 3 was a 65,292-square-foot office facility built in 1982 that sold for a time-trended price of $143.72 per square foot. (*Id.* at 28, 35.)

Herman testified that he was aware of the Royal Caribbean sale, but did not rely upon it because it was a sale leaseback, which he did not consider to be a market transaction. Herman provided his notes stating that, according to the "developer/owner (Workstage-Oregon LLC)," the property was "built for Royal Caribbean as a leaseback - Named 'Building of the year' - Was a 'Custom Class A' building - nothing like it - you would never see a call center like it - He then sold it to RC Springfield 2007 'Hampshire Partners' in New Jersey as sale/leaseback."

---

[6] Elsewhere in the report, Baribeault's Sale 2 is identified as 109,800 square feet and also as 106,259 square feet. (*Id.* at 34.)

(Ptf's Ex 5 at 1.)  The property is LEED Gold Certified and was Royal Caribbean's "third and largest Customer Service Center to date." (*Id.* at 3.)  Herman testified that the property cost $60 million, including $7 million for land, and sold two years later for $46.9 million.  (*Id.* at 1, 37.)

Gillespie testified that she confirmed the Royal Caribbean sale.  She testified that Royal Caribbean never owned the property, so it was not a sale leaseback.  Gillespie testified that the Royal Caribbean property developer leased the property to Royal Caribbean and that lease continued through the sale in 2008.  (*See* Ptf's Ex 5 at 9 (listing stated "net lease investment with 10+ years left on lease" and "[n]on recourse financing in place and completely assumable").)  She testified that the lease rate was effective January 2006 for a 20 year term at an initial rate of $1.84 per square foot, triple net.  (*See* Ptf's Ex 5 at 24; Def's Ex A at 33.)

3.  *Plaintiff's cost approach*

Herman wrote that, according to Plaintiff, "the actual direct and indirect cost[s] of Buildings 'A' and 'B' were $29,235,964 and $47,541,610." (Ptf's Ex 1 at 65.)  He testified that the actual costs of the seismic upgrade were included in the Building B cost.  Herman wrote that, based on "Marshall Valuation Service [MVS] cost trend data * * * the cost of replacement for Building 'A' as of January 1, 2012 would have approximated $42,538,328 whereas the replacement cost of Building 'B' would have approximated $58,190,931 after applying interceding inflation adjustments of 45.5 percent and 22.4 percent, respectively[,]" for a total trended "cost of production" of $100,729,259.  (*Id.*)

Herman testified that he used his sales 1, 2, 3, and 6 to determine market extracted depreciation and found annual depreciation rates ranging from 4.0 to 9.7 percent.  (Ptf's Ex 1 at 65.)  For sales 2 and 3, he compared the building cost with a subsequent sale price and for sales 1 and 6 he compared a sale with a resale.  (*Id.*)  Herman concluded annual depreciation of 8

percent for a total depreciated improvements cost of $38,140,845 and a total indicated value under the cost approach of $51.6 million, rounded. (*Id.* at 65-66.) Herman explained his large depreciation estimates, stating "this property type experiences considerable depreciation during the early years of its economic life, which can be largely attributed to the highly individualized physical and functional characteristics of each building relative to its initial owner/user, as well as subsequent changes in technology and desirable functional attributes." (*Id.* at 65.)

Gillespie testified that properties used to determine market extracted depreciation must be comparable to the subject property. She testified that MVS recommends five percent depreciation for a commercial property with a 50-year life expectancy and an effective age of eight years. (*See* Def's Ex A at 59.)

4. *Defendant's cost approach*

Baribeault testified that he used MVS to calculate the replacement cost new of the subject property's improvements and he used Plaintiff's actual costs for the seismic upgrade. (*See* Def's Ex A at 29.) He testified that, based on the MVS age-life method and an effective age of eight years, he determined five percent depreciation for the subject property and 10 percent functional obsolescence due to the super-adequate seismic upgrade. (*Id.* at 30.) Baribeault concluded a total indicated value of $96.4 million, rounded, under the cost approach. (*Id.* at 29.) In his final reconciliation, he concluded a total real market value of $96 million. (*Id.* at 31.)

The total 2012-13 tax roll real market value of the subject property's buildings and structures, sustained by the board of property tax appeals, was $85,603,115. (Inv's Post-Trial Br at 2.) Plaintiff's appraiser Herman concluded that the subject property's 2012-13 real market value was $32,500,000, indicating a real market value of $19,052,540 for the buildings and structures. (Ptf's Post-Trial Br at 1; Inv's Post-Trial Br at 2.) Defendants' appraiser Baribeault

concluded that the subject property's 2012-13 real market value was $96,000,000, indicating a real market value of $82,552,540 for the buildings and structures. (Inv's Post-Trial Br at 2.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003). Real market value is defined in ORS 08.205(1),[7] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches of value that must be considered under the applicable administrative rule are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* "If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(2)(c).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. *See* ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

"Taxpayers must provide competent evidence of the [real market value] of their property."
*Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [its] burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Highest and best use*

"The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use." *Freedom Fed. Savings and Loan v. Dept. of Rev.* (*Freedom Fed*), 310 Or 723, 726-27, 801 P2d 809 (1990) (emphasis in original); *see also STC Submarine, Inc. v. Dept. of Rev.* (*STC Submarine*), 320 Or 589, 593, 890 P2d 1370 (1995). Highest and best use is defined as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e) (quoting Appraisal Institute, *The Appraisal of Real Estate* (12th ed 2001)). "[T]he [highest and best use] affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis." *Hewlett-Packard Company. v. Department of Revenue* (*Hewlett-Packard*), __ OTR __ (May 15, 2013) (slip op at 3).

"Often there is little or no question that the current use of a property is the [highest and best use]." *Id.* "If the existing use will remain financially feasible and is more profitable than modification or redevelopment, the existing use will remain the highest and best use of the

property as improved." Appraisal Institute, *The Appraisal of Real Estate* (*Appraisal of Real Estate*) 288 (13th ed 2008); *see also STC Submarine*, 320 Or at 594 ("[t]he department's evidence that, as of the assessment date, a market demand continued to exist for taxpayer's products and services supports the department's conclusion that taxpayer's existing use of its building and structures was their 'highest and best use' ").

Plaintiff asserts that "[b]oth parties determined that the highest and best use of the subject property is its current use[,]" although the parties' appraisers described the subject property's current use differently. (Ptf's Post-Trial Br at 2.) Herman described the subject property as a "technical support/call center" whereas Baribeault described it as a "computer data center." (*Id.* (citations omitted).) Although Herman concluded that the subject property's highest and best use was "the existing use and occupancy," he added "or some other form of adaptive reuse such as a data center, corporate headquarters or government offices." (Ptf's Ex 1 at 6.) Herman did not provide a clear explanation in response to questioning whether it was his opinion that the subject property had multiple highest and best uses. It may be that he intended only to state that other "adaptive reuse[s]" of the subject property were physically possible, legally permissible, and financially feasible. No evidence was presented to suggest that the subject property's current use was not its highest and best use as of January 1, 2012.

B.    *No immediate market value*

Baribeault concluded that the subject property was a "special use" property based on its superior features and its specific upgrades for servers and data storage. He further concluded that no immediate market existed for the subject property because he was not aware of any sales of data centers. Defendants argue, therefore, that the correct standard to be applied is "the amount of money that would justly compensate [Plaintiff] for loss of the improvements" under

ORS 308.205(2)(c) and that the cost approach must be used. (*See* Inv's Post-Trial Br at 14-15, 27-28.)

In *Freedom Fed*, the defendant's appraiser determined "that a market approach to valuation was impossible, because there were no comparable sales. His written appraisal noted that financial institutions do not usually buy their headquarters buildings, but instead build them to their own specifications." 310 Or at 728. The Court reviewed the sales presented by the plaintiff's appraiser and found "that none of those sales was of comparable property." *Id.* at 727-28. On that record, the Court agreed with the defendant "that the cost approach was the most appropriate method to value the property." *Id.* at 728-29. Similarly, in *Les Schwab Tire Centers v. Crook County Assessor*, 14 OTR 588, 594 (1999), this court concluded that

> "[w]ith over 1,600,000 square feet of mostly warehouse in a small city in central Oregon, neither party suggests that the evidence shows any 'immediate' market value. The court finds that there are no comparable sales or rentals within a reasonable distance, time, and proximity and therefore no 'immediate' market for the subject property."

Herman presented six sales of properties that he considered comparable to the subject property. He testified that those sales demonstrated that an active market exists for properties such as the subject property. As discussed below, the court disagrees that Herman's sales are sufficiently comparable to the subject property to provide a meaningful value indication in this case. Baribeault also used the sales comparison approach, although he testified that most of his sales were not comparable to the subject property. In their post-trial briefs, Defendants argued that none of the sales presented by either appraiser were comparable to the subject property and all weight should be placed on the cost approach. (Inv's Post-Trial Br at 27-28.)

/ / /

/ / /

C.    *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citation omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used." OAR 150-308.205-(A)(2)(c).

As noted previously, the court is not persuaded that any of the sales presented by Herman provide meaningful value indications for the subject property. The subject property was described by Herman as a technical support and customer service call center. The parties agree that the majority of the subject property's 405,000 square feet was class A office space, although precise figures were not provided. The utility of at least four of Herman's comparable sales differed from that of the subject property. Herman's first three sales were "manufacturing facilities." Although sale 5 was described as corporate headquarters for a manufacturing company, the property was predominantly warehouse and manufacturing space with 44,000 square feet out of 54,095 square feet total. Herman testified that it costs more to build class A office space than to build warehouse or manufacturing space. Thus, to the extent that a property was predominantly manufacturing or warehouse space, that property is of lesser value than the subject property.

Herman suggested that several of his sales were comparable to the subject property because they included office area. However, the office areas in each of those properties were either significantly smaller than the subject property or unknown. Sale 1 included 32,000 square

feet of class A office and 33,800 square feet of administrative office.[8] Sale 2 included some amount of office area, but Herman testified he did not know how much. Sale 3 included 15,000 square feet of class A office and sale 5 included 9,790 square feet of "high quality office space." Those properties are not comparable to the subject property.

Herman's comparable sales 1, 2, 3, and 4 were purchased for either "adaptive re-use" or "reposition[ing]," suggesting that the buyers anticipated additional costs to modify those properties for a different use. Herman acknowledged in his report that, "[i]n most instances, the purchaser necessarily had to reposition the property for its intended use and occupancy." (Ptf's Ex 1 at 63.) He testified that he was not aware of the buyer's anticipated costs associated with repositioning or adaptive re-use of any of his comparable sales. That four of Herman's sales were purchased for repositioning or a different use suggests that the reported sales prices are low indications of value and do not reflect the total price anticipated by the buyers.[9] Moreover, it suggests that the properties were not comparable to the subject property at the time of sale and would require costly additional modifications to be made comparable to the subject property.[10]

Of Herman's sales, the most comparable to the subject property was sale 6, a 176,609- square-foot corporate headquarters built in 1999 that included 138,000 square feet of class A office space. Herman reported that the property had been marketed as a call and data center before it sold to a manufacturer of medical equipment for $78.56 per square foot.

---

[8] Herman stated that 55,800 square feet was class A office; it is unclear if part of the administrative office was class A.

[9] "A knowledgeable buyer considers expenditures that will have to be made upon purchase of a property because these costs affect the price the buyer agrees to pay. * * * These costs are often quantified in price negotiations and can be discovered through verification of transaction data. The relevant figure is not the actual cost that was incurred but the cost that was anticipated by both the buyer and seller." *Appraisal of Real Estate* at 331.

[10] Baribeault's sale 3 illustrates that point. The City of Eugene purchased the property, a 65,292-square-foot office building, for $10.2 million for "remodeling for police department use and occup[ancy of] the entire building." (Def's Ex A at 35.) However, the anticipated renovation cost was an additional $5.8 million. (Ptf's Ex 8 at 3, 5.)

Baribeault considered the Royal Caribbean sale to be the most comparable to the subject property. Herman testified that he agreed the Royal Caribbean property itself was comparable to the subject property, but he did not rely on the sale because it was a sale leaseback. Gillespie testified that, although the property was leased at the time of sale, it was not a sale leaseback. The evidence presented by both Herman and Gillespie indicates that the Royal Caribbean transaction was not a sale leaseback, although the property was leased at the time of sale.

Plaintiff challenged Baribeault's reliance on sales of leased properties, arguing that such transactions cannot be used to determine the value of a fee simple estate absent adjustments for the different rights conveyed. (Ptf's Post Trial Br at 5-6.) Baribeault testified on cross-examination that a buyer of a leased property is looking for an income stream whereas an owner-occupant is looking for a building for its own use. The *Appraisal of Real Estate* supports Plaintiff's contention that the sale of a leased fee may be used as a comparable for a fee simple interest in the subject property only if the appraiser makes any necessary market adjustments. *Appraisal of Real Estate* at 301, 323.[11] The appraiser must determine whether the contract rent is market rent. *See id.* at 323; *see also Pollin v. Dept. of Rev.*, 13 OTR 478, 480 (1996) ("[t]he *value* of a leasehold estate depends upon whether the contract rent required by the lease is a market rent. If the contract rent is equal to fair market rent, the value of a leasehold interest is zero").)

---

[11] "The sale of a property encumbered by a lease involves rights other than the complete fee simple estate, and valuation of those rights requires knowledge of the terms of all leases and an understanding of the tenant or tenants occupying the premises." *Appraisal of Real Estate* at 301. "By definition, the owner of real property that is subject to a lease no longer controls the complete bundle of rights, i.e., the fee simple estate. If the sale of a leased property is to be used as a comparable sale in the valuation of the fee simple interest in another property, the comparable sale can only be used if reasonable and supportable market adjustments for the differences in rights can be made. For example, consider the appraisal of the fee simple interest of real estate that is improved with an office building. A comparable improved property was fully leased at the time of sale, the leases were long-term, and the credit ratings of the tenants were good. To compare this leased fee interest to the fee simple interest in the subject property, the appraiser must determine if the contract rent of the comparable property was above, below, or equal to market rent." *Id.* at 323.

The Royal Caribbean property is the most comparable property to the subject property with respect to its use, design, age, and size. However, Baribeault made no adjustments to the sale for the property rights conveyed and did not provide any evidence that no adjustments were required. Gillespie testified that Royal Caribbean was leased at $1.84 per square foot, triple net, at the time of sale, but the court received no evidence indicating whether that rate was above or below market.[12] The evidence presented under the sales comparison is inconclusive. If the subject property had an immediate market value as of January 1, 2012, it is not reflected by the sales presented by either appraiser and the court looks to the cost approach.[13]

D.    *Cost approach*

"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citing *The Appraisal of Real Estate* at 63). The cost approach is "particularly useful in valuing new or nearly new improvements," but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.*

Herman relied on Plaintiff's reported actual costs and Marshall Valuation Service (MVS) trends to determine a reproduction cost of about $100.7 million for the subject property. Baribeault used MVS to determine a replacement cost new of about $97.5 million. Plaintiff

---

[12] Herman provided an excerpt from the Sperry Van Ness *Eugene Mid-Year Report* for July 2013 stating that class A rents ranged from $1.65 to $2.00 per month, full service. (Ptf's Ex 1 at 23.) That evidence does not help the court determine whether the triple net lease of Royal Caribbean was the market rate as of the January 2008 sale.

[13] In *Truitt Brothers, Inc. v. Dept. of Rev.*, 10 OTR 111, 114-115 (1985), this court explained that ORS 308.205(2)(c) "is simply saying that if there is no immediate market, then the value of the property is to be estimated using a method other than the sales comparison approach. The value sought by those other methods, however, whether the income approach or cost approach, is nevertheless the value in exchange or market value. * * * In this case, then, the importance of determining whether an 'immediate market' exists for the subject property relates to the methods of appraisal which are to be used or relied upon in determining the true cash value of the property."

questioned Baribeault at length about his cost approach and exposed several errors that he made in arriving at his replacement cost new. Baribeault acknowledged some of the errors on cross-examination; for instance, he used the local cost modified for Eugene rather than Springfield. (*See* Ptf's Ex 6 at 2.) Ultimately, however, the primary difference between Herman's and Baribeault's conclusions under the cost approach was in their depreciation calculations.

The market extraction and economic age-life methods are both recognized methods for estimating depreciation. *Appraisal of Real Estate* at 409. "With the market extraction method, * * * it is important to use comparable properties that have the same physical, functional, and external characteristics as the subject" property. *Id.* at 411. "The market extraction method relies on the availability of comparable sales from which depreciation can be extracted. * * * [I]t should only be used if sufficient data exists and if the quality of that data is adequate to permit meaningful analysis." *Id.* at 416. "When the comparable properties differ in design, quality, or construction, it is difficult to ascertain whether differences in value are attributable to these characteristics or to a difference in age, and thus depreciation." *Id.* at 420.

Herman testified that he used the market extraction method to determine eight percent annual depreciation for the subject property. The court has several concerns with Herman's application of the market extraction method, the most critical of which is the comparability of the sales that he used to extract depreciation estimates. Herman relied on several sales from his sales comparison approach and, as discussed above, the court is not persuaded that those properties were similar to the subject property. Moreover, several of the properties sold for adaptive reuse or repositioning, suggesting that part of the depreciation captured in Herman's calculations is inapplicable to the subject property, the highest and best use of which is its current use.[14]

---

[14] "By considering all elements in one calculation, market extraction can be an oversimplification of the complex interplay of physical, functional, and external causes of depreciation. The technique is primarily used to

Baribeault used the economic age-life method to calculate depreciation, which is an accepted method according to the *Appraisal of Real Estate*. *Id.* at 409. The court is persuaded that Baribeault's conclusion under the cost approach provides an overall more reliable value indication.

III. CONCLUSION

Although both parties presented evidence under the sales comparison approach, the court found that evidence to be largely unreliable and inconclusive. The court is left only with value indications under the cost approach. The primary difference between the appraisers' conclusions under the cost approach was their estimates of depreciation. The court found Baribeault's estimate more reliable and accepted his 2012-13 real market value conclusion of $96 million, for a value of $82,552,540 for the subject property's buildings and structures. Now, therefore

IT IS THE DECISION OF THIS COURT that the buildings and structures real market value of property identified as Accounts 1542495, 1518727, and 1854049 was $82,552,540 for the 2012-13 tax year.

Dated this ____ day of March 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR. Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.*

*This Final Decision was signed by Magistrate Allison R. Boomer on March 17, 2014. The Court filed and entered this Final Decision on March 17, 2014.*

extract total depreciation, to establish total economic life expectancy, and to identify other types of obsolescence or excess physical deterioration." *Appraisal of Real Estate* at 416.